UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ST. JOSEPH ABBEY, ET AL.** | **CIVIL ACTION** |
| **VERUS** | **NO. 10-2717** |
| **PAUL "WES" CASTILLE, ET AL.** | **SECTION "K"(5)** |

## ORDER AND REASONS

Before the Court are Plaintiffs' Motion for Preliminary Injunction (Doc. 22) filed by St. Joseph Abbey and Mark Coudrain (Plaintiffs) and Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) or Alternatively, Motion for Judgment on the Pleadings Pursuant to Rule 12(c) filed by Paul "Wes" Castille, Oscar A. Rollins, Belva M. Pichon, Craig G. Gill, Andrew Hayes, Wall V. McKneely, Margaret Shehee, Kelly Rush Williams, and Louis Charbonnet, in their official capacities as Members of the Louisiana State Board of Embalmers and Funeral Directors (Defendants or EFD Board). (Doc. 38). The gravamen of this dispute concerns the Benedictine monks of Saint Joseph Abbey and their wish to sell wooden caskets.

On August 12, 2010, Plaintiffs filed the instant Complaint for Declaratory and Injunctive Relief pursuant to the Fourteenth Amendment to the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Declaratory Judgment Act, 28 U.S.C. § 2201. (Complaint, ¶ 1). Plaintiffs seek declaratory relief against the enforcement of Louisiana's Embalming and Funeral Directors Act, La. Rev. Stat. Ann. § 37:831-:885 ("the Act"), and the practices and policies of the EFD Board which deny Plaintiffs the ability to sell caskets at retail without being licensed as required under the Act. Mark Coudrain ("Coudrain") is an ordained deacon of the Archdiocese of New Orleans and is employed at the Abbey as the director of both the Christian Life Center and Saint Joseph Woodworks which seeks to hand-make and sell

monastic caskets to the general public. He is not a licensed funeral director under Louisiana Law. (Complaint, ¶7).

Plaintiffs allege that Louisiana's funeral-licensing laws and regulations violate Plaintiffs' constitutional rights to Due Process in that:

> 74. Louisiana's Funeral-licensing laws and regulations violate Plaintiffs' right to due process of the law under the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. §1983 on their face and as-applied to the extent that Louisiana law requires individuals to be licensed funeral directors merely to engage in the retail sale of caskets, to the extent that Louisiana law requires entities to be licensed funeral establishments to engage in the retail sale of caskets, and to the extent that Louisiana law requires the free storage of purchased caskets to comply with the requirements of a "pre-need" funeral-services contract.

(Complaint, ¶74). And with respect to the violation of the Equal Protection Clause, Plaintiffs allege:

> 77. By requiring the sellers of simple wooden caskets to comply with an arbitrary and irrelevant licensing scheme that is not rationally related to any legitimate public health and safety concerns, but is instead designed for another profession, Defendants, their agents, and employees are treating two distinct and different occupations as the same and therefore violate the rights of Plaintiffs to equal protection of laws as guaranteed by the Fourteenth Amendment to the U.S. Constitution.

(Complaint, ¶ 77).[1]

Indeed, under the Act, it is unlawful for anyone to conduct the business of funeral directing or to engage in the business of funeral directing as defined in La. Rev. Stat. 37:831 unless such business is conducted by a duly licensed funeral establishment. La. Rev. Stat. 37:848 (A) and (C). "Funeral directing" is defined in relevant part as "the operation of a funeral

---

[1] It should be noted that Plaintiffs also brought a Privileges or Immunities Claim; however, they concede that this claim is foreclosed by the *Slaughter-House Cases*, 18 U.S. (16 Wall) 36 (1873) and that they raised and argued this claim in order to preserve it for appeal. (Doc. 42, Plaintiffs' Opposition to Motion to Dismiss at 1).

home, or, by way of illustration and not limitation, any service whatsoever connected with the management of funerals, or the supervision of hearses or funeral cars, the **purchase of caskets or other funeral merchandise**, **and retail sale and display thereof,** . . . ." La. Rev. Stat. 37: 831(35) (emphasis added). "Funeral establishment" is defined as "any place or premises duly licensed by the board and devoted to or used in the care and preparation for burial of the body of a deceased person or maintained or held out to the public by advertising or otherwise as the office or place for the practice of funeral directing." La. Rev. Stat. 37:831(37).

Thus, under the Act, in order to simply sell wooden caskets, the monks of the Abbey and/or Mark Coudrain would have to complete a full-time apprenticeship with a licensed funeral director during which time such person would have to make that his principal occupation and be employed full-time as such. La. Rev. Stat. § 37:842; La. Admin Code tit. 46, § 903(4)-(5). Examinations conducted by the EFD Board concerning sociology, psychology, funeral directing, and funeral-service law, would have to be passed. La. Rev. Stat. § 37:842; La. Admin. Cod tit. 46, §503. Also continuing education requirements pertaining to funeral directing would have to be completed. La. Admin. Code tit. 46, § 709. In addition, the Abbey itself would have to become a licensed funeral establishment and employ a state-licensed funeral director. It would also have to install embalming facilities for the sanitation, disinfection and preparation of a human body. La. Rev. Stat. §37:842(D)(1) and (3). Plaintiffs contend none of these requirements have any rational basis for them to be able simply to sell wooden caskets made by them at the Abbey.

The monks of Saint Joseph Abbey seek to sell these simple wooden coffins which they contend are significantly less expensive than the average coffin sold through the traditional

funeral home.  They do so to generate income as they are self-sustaining and receive no support from the Catholic church.  Their previous method of raising funds–harvesting timber–will not sustain them in the future.  They also intended to store pre-need, purchased caskets at no charge for the customer.  Plaintiffs contend that this is not analogous to the procedure where a customer pays for a casket on a "pre-need basis" and the seller holds the money in trust until the customer dies and then the seller purchases or in this instance builds the casket.  In this regard, Plaintiffs contend that where the Abbey sells a casket prior to the need, it simply provides free storage for that casket.  They maintain that the requirements under the Act are onerous and without a rational basis other than pure economic protectionism for the benefit of the funeral industry (Rec. Doc. 33, p. 13).

As Plaintiffs were gearing up to begin this new venture, and before the first casket was sold, the EFD Board ordered them to cease and desist from the direct sale of caskets or other funeral merchandise as they were not in compliance with the law.  Nonetheless, the Abbey apparently began selling the caskets.  After a complaint from a funeral-home establishment was filed, the Abbey was investigated.  The Abbey attempted to obtain a legislative solution for this situation, but to no avail.  On March 30, 2010, a Subpoena issued by the EFD Board:

> "[i]n that they have allegedly sold caskets to several consumers; and/or, has allegedly violated the provision s of LA R.S. 37:861 in that they have advertised on their website and/or in a brochure that "We encourage you to pay for your casket now to take advantage of the current price.  But you don't have to worry about storage.  When the time arrives for the need of the casket, you can simply have the funeral home contact us and we will deliver your casket."

Plaintiffs' Motion for Preliminary Injunction, Exh 4. (Doc. 22-2, p. 12 of 13).

The lawsuit was filed on August 12, 2010 and the instant Motion for Preliminary Injunction was filed on September 14, 2010, challenging the state licensing laws and regulations

which, as previously described, require one to be a licensed funeral director operating through a licensed funeral home to sell caskets directly to the public. In addition, they sought to not be subject to the "pre-need" law which requires them to place all funds paid for any funeral merchandise on a pre-need basis into a special account or insurance policy to be utilized at the time of the consumer's death to pay for such merchandise.

An Unopposed and Incorporated Memorandum to Continue and Reset Hearing (Doc.23) was filed after which the Court held a status conference. The motion was reset to October 13, 2010. (Doc. 25). However, the parties then moved for a further continuance and agreed that the matter would be taken on the papers after all briefing on that motion would be completed by November 12, 2010.

On December 6, 2010, Defendants filed the instant Motion to Dismiss Pursuant to Rule 12(b)(6), or alternatively, Motion for Judgment on the Pleadings Pursuant to Rule 12(c). (Doc. 38). This motion seeks dismissal of the entire matter based on a single legal issue–whether protecting a discrete interest group from economic competition constitutes a legitimate government purpose. While defendants maintain that the laws and regulations at issue herein do not have protection of the funeral industry's monopoly as their sole purpose, they contend that the Complaint fails to state a claim upon which relief may be granted under the Due Process and Equal Protection Clauses of the Fourteenth Amendment because such protection is recognized as a sufficient legitimate government interest under the rational-basis test. *Powers v. Harris*, 379 F.3d 1208, 1215 (10th Cir. 2004). Thus, taking Plaintiffs' allegations as true– that these laws and regulations are simple economic protectionism with no other purpose– Plaintiffs have no claim. Plaintiffs contend that such protectionism does not provide a *per se* rational basis relying

primarily on *Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002). Both cases concern the regulation of casket sales through the use of state laws similar to the ones at issue herein. Thus, there is a circuit split and the United States Court of Appeal for the Fifth Circuit has not spoken on this issue. So the Court will now discuss the Motion to Dismiss.

**Standard for Review**

In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the original complaint must be taken as true. *Campbell v. Wells Fargo Bank, N.A.,* 781 F.2d 440, 442 (5th Cir.1980). In *Bell Atlantic Corporation v. Twombly,* 550 U.S. 544, 563, 127 S.Ct. 1955, 1969 (2007), the Supreme Court "retired" the *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957), standard for analyzing a motion to dismiss under Rule 12(b)(6) which held that a district court may not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Noting that the *Conley* pleading standard "is best forgotten as an incomplete, negative gloss on an accepted pleading standard," the Supreme Court announced that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations of the complaint. *Id.* at 563, 127 S.Ct. at 1969. "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In Re: Katrina Canal Breaches Litigation,* 495 F.3d 191, 205 (5th Cir.2007) quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974. Factual allegations must be enough to raise a right to relief above the speculative level, on the

assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly,* 550 U.S. at 556, 127 S.Ct. at 1965 (internal citations omitted). "The question therefore is whether in the light most favorable to the plaintiff and with every doubt resolved in his favor, the complaint states any valid claim for relief." *Lowery v. Texas A & M University System,* 117 F.3d 242, 247 (5th Cir.1997) quoting 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 1357, at 601 (1969). A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a motion to dismiss. *Doe v. MySpace,* 528 F.3d 413, 418 ( 5th Cir. 2008).

**Analysis**

As stated in *Craigmiles*:

> The Supreme Court has established a tripartite rubric for analyzing challenges under the Equal Protection and Due Process clauses. When a statute regulates certain "fundamental rights" (*e.g.* voting or abortion) or distinguishes between people on the basis of certain "suspect characteristisc" (*e.g.* race or national origin), the statute is subject to "strict scrutiny." *Zablocki v. Redhail*, 434 U.S. 374, 388, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). To survive strict scrutiny, the regulation must serve a compeling state purpose and be narrowly tailored to achieving that purpose. *Ibid.* The Supreme Court has identified other classifications, such as gender and illegitimacy, which are less "suspect," and are therefore subject only to intermediate scrutiny, under which the regulation need only serve an "important" state interest and the means employed need only be "substantially related" to that interest. *See J.E.B. v. Alabama,* 511 U.S. 127, 136, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994); *Mississippi Univ. For Women v. Hogan*, 458 U.S. 718, 725, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982).
>
> All other regulations are subject to "rational basis" review, requiring only that the regulation bear some rational relation to a legitimate state interest. *Romer v. Evans*, 517 U.S. 620, 632, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996).

*Craigmiles*, 312 F.3d at 223.

The substantive component of the Due Process Clause "'provides heightened protection against government interference with certain fundamental rights and liberty interest . . . even when the challenged regulation affects all persons equally.'" *Powers*, 379 F.3d at 1215 (citing *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). On the other hand, the Equal Protection Clause insures that the state treats all those similarly situated similarly. *Powers*, 379 F.3d at 1215 (citing *Bartell v. Aurora Pub. Schs.*, 263 F.3d 1143, 1149 (10th Cir. 2001)). Nonetheless, the rational basis review standard for equal protection and for substantive due process "converge" and are in essence the same. *Powell,* 379 F.3d at 1215; *Craigmiles*, 312 F.3d at 223; Anthony Sanders, *Exhumation Through Burial: How Challenging Casket Regulations Helped Unearth Economic Substantive Due Process in Craigmiles v. Giles*, 88 Minn. l. Rev. 668, 674 n. 50 (2004).

Rational basis review requires "only that the regulation bear some rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631(1996). This requirement translates into a two part test–that is whether (1) the regulation has a legitimate governmental purpose; and (2) there is a rational relationship between that purpose and the means chosen by the State to accomplish it. *Casket Royale, Inc. v. State of Mississippi*, 124 F. Supp. 2d 434, 437 (S.D. Miss. 2000)(Barbour, J) (funeral statutes and regulations prohibiting sale of caskets without licenses violated due process and equal protection clauses citing *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997)). And so the issue presented is whether protecting a discrete interest group from economic competition is a legitimate governmental purpose.

The *Craigmiles* court found unequivocally that the kinds of prohibitions at issue in this case bear no rational relationship to any legitimate purpose and thus violated equal protection and due process clauses. In that case, Nathaniel Craigmiles and several other plaintiffs challenged a provision of the Tennessee Funeral Directors and Embalmers Act that prohibited anyone from selling caskets without being licensed by the state as a "funeral director." Similar to the case at bar, to be licensed required an applicant to undergo a period of education and training which had little to do with casket design or selection for a period, in essence, of two years. *Craigmiles*, 312 F.3d at 222. Plaintiffs operated two independent casket stores in Tennessee; they sold caskets, urns, grave markers, monuments, and straight merchandise items. The store did not embalm or arrange funeral services, cremations or burials. Like the case at bar, the Board of Funeral Directors and Embalmers, ordered the plaintiffs to cease and desist and the plaintiffs brought suit.

Noting that a rational basis review requires only that "the regulation bear some rational relation to a legitimate state interest", the *Craigmiles* court noted:

> Even foolish and misdirected provisions are generally valid if subject only to rational basis review. As we have said, a statute is subject to a "strong presumption of validity" under rational basis review, and we will uphold it "if there is any reasonably conceivable state of facts that could provide a rational basis." *Walker v. Bain,* 257 F.3d 660, 668 (6th Cir. 2001). *See also Heller v. Doe*, 509 U.S. 312, 319, 113 S. Ct. 2637, 125 L.Ed.2d 257 (1993). Those seeking to invalidate a statute using rational basis review must "negative every conceivable basis that might support it." *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed. 2d 351 (1973).

*Id.* at 223-24. The court commented that a 1972 amendment to the law which swept into the pre-existing laws concerning "funeral directing" the sale of funeral merchandise was designed only for the economic protection of funeral home operators.

      As such, the *Craigmiles* court stated:

> Courts have repeatedly recognized the protecting a discrete interest group from economic competition is not a legitimate governmental purpose. *See City of Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475, (1978) ("Thus, where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected.") *See also H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 537-38, 69 S. Ct. 657, 93 L.Ed. 865 (1949); *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983) (distinguishing between legitimate state purposes and "providing a benefit to special interest"). At trial, the plaintiffs adduced evidence that funeral home operators sell caskets at prices substantially over total costs. The FDEA has the effect, at least, of preventing individuals who are not licensed funeral directors from selling caskets, potentially at a lower price. In this case the district court found that funeral home operators generally mark up the price of caskets 250 to 600 percent whereas casket retailers sell caskets at much smaller margins. *See Craigmiles,* 110 F. Supp.2d at 664.

*Craigmiles,* 312 F.3d at 224. The court also noted that while retailers could pursue the required licenses, clearly these requirements placed a significant barrier to entering the Tennessee casket market. Thus, the Sixth Circuit rejected the position that Defendants take in this case.

      The Sixth Circuit does not stand alone in its approach. In *Peachtree Caskets Direct, Inc. v. State Board of Funeral Service of Geogia,* 1999 WL 33651794 (N.D.Ga. Feb. 9, 1999), a district court issued a permanent injunction preventing the enforcement of a statute which prohibited the sale of caskets and alternative containers for human remains by any person who was not licensed as a funeral director and at any place other than a licensed funeral establishment. The court found that the law was not related to any legitimate state interest because neither the statute nor any rules contained standards for the design, construction or sale of caskets or alternative containers. *Id.* at *1.

Likewise, in *Casket Royale, Inc. v. State of Mississippi*, 124 F. Supp.2d 434 (S.D. Miss. 2000), the Court found no rational basis for a similar law finding that there was no rational relationship between licensure and government objectives of prompt human remains disposal and consumer protection–which were the two bases offered by the state of Mississippi. The court noted, "While there is a legitimate governmental interest in the prompt disposition of an unpreserved human body, the regulation in question does not advance this interest as nothing inherent in the licensing requirement, at least in regard to a coffin, would offer a quicker burial or cremation." *Id.* at 438. As to consumer protection, the court found that the law actually diminished it. "As a result of this requirement, consumers in Mississippi are offered fewer choices when it comes to selecting a casket. Consequently, there is less price competition among the sellers of caskets. Ultimately the consumer is harmed by this regulation as one is forced to pay higher prices in a far less competitive environment." *Id.* at 440.

However, the United States Court of Appeals for the Tenth Circuit paints with a broader brush. There, funeral licensing requirements for the sale of caskets that were substantially similar to those at issue herein were in place in Oklahoma. To sell caskets required training, licensing and physical location with the capacity to embalm. Memorial Concepts Online, Inc., an Oklahoma corporation, and its owners sought to sell caskets in Oklahoma over the Internet. They brought suit challenging the constitutionality of the Oklahoma Funeral Services Licensing Act based on the Privileges and Immunities Clause which was summarily dismissed and the Due Process and Equal Protection Clauses.

The Tenth Circuit court found that economic protectionism alone is a legitimate state interest that provides a rational basis to make the law in question constitutional. In rejecting the

11

*Craigmiles* approach, the Sixth Circuit argued that the Tenth Circuit had achieved its decision by "selective quotation" of Supreme Court cases dealing with *interstate* rather than *intrastate* commerce noting language found in *H.P. Hood & Sons v. Du Mond*, 336 U.S. 525 (1949) which was couched in terms of *interstate* commerce.  To rebut this position, the Tenth Circuit opined:

> In contrast, the Supreme Court has consistently held that protecting or favoring one particular intrastate industry, absent a specific federal constitutional or statutory violation, is a legitimate state interest.  *See Fitzgerald,* 539 U.S. at 109, 123 S.Ct. 2156 (holding that the hypothetical goal of fostering intrastate riverboat gambling provided a rational basis to support legislation taxing riverboat slot machine revenues at a more favorable rate than those from racetrack slot machines); *Ferguson*, 372 U.S. at 730-31, 83 S. C5. 1028 ("It is now settled that States have power to legislate against what are found to be injurious practices in their internal commercial and business affairs, so long as their laws do not run afoul of some specific federal constitutional prohibition, or of some valid federal law.") (quotations omitted); *Dukes* 427 U.S. at 304 n. 5, 96 S.Ct. 2513 ("[T]hese principles . . . govern only when no constitutional provision other than the Equal Protection Clause itself is apposite.  Very different principles govern even economic regulation when constitutional provisions such as the Commerce Clause are implicated, or when local regulation is challenged under the Supremacy Clause as inconsistent with relevant federal laws or treaties.").

*Powers*, 379 F.3d at 1220.

However, this Court finds this discussion less than convincing.  For instance in the *Fitzgerald* case, upon which the *Powers* court relies, the state there taxed riverboat slot machine revenues at a lesser rate than racetrack slot machine revenues.  The Supreme Court found that the state was furthering a legitimate state interest in helping the river boat industry.  Clearly, the *Fitzgerald* case is distinguishable from the case at bar.  For *Fitzgerald* to be properly analogous to the case at bar, the Supreme Court would have to have found that it was constitutional to completely shut-down the racetrack slot-machines in favor of the riverboat slot machines

because in essence that is what the Act and regulations in question do–they in essence bar all competition from outside of the "funeral directors" enclave for the sale of caskets.

Another case cited by *Powers* concerns the Supreme Court's rejection of an Equal Protection Clause challenge to a New Orleans ordinance that prohibited selling foodstuffs from push-carts in the French Quarter, even though it exempted area vendors who had continuously operated that business for eight or more years. *New Orleans v. Dukes,* 427 U.S. 297, 303, (1976). In that case, the Supreme Court found that it had a legitimate objective–that was to benefit the tourist industry–for the regulation to stand.

The Tenth Circuit then opined that the case of *Williams v. Lee Optical of Oklahoma,* 348 U.S. 483 (1955) "so closely mirrors the facts of this case that, but for the Siren's song that has recently induced other courts to strike state economic legislation similar to the FSLA, merely a citation to *Williamson* would have sufficed to dispose of this case." However, a close reading of *Williams* calls into question such a sweeping comparison. At issue in *Williamson* was a statute which required an optometrist or ophthalmologist license to fit eyeglass lenses without a written prescription. In essence, this law benefitted these two eye specialists to the detriment of opticians. Indeed, the Supreme Court found that "a state may set as a legitimate goal 'free[ing a] profession, to as great an extent as possible, from all taints of commercialism." *Id.* at 491. At the heart of that decision was the regulation of the health–the eyesight–of an individual who would purchase glasses. The Supreme Court recognized that the legislature might have legitimate concerns about the public's health and safety. "[T]he legislature may have concluded that eye examinations were so critical, not only for correction of vision but also for detection of latent ailments or diseases that every change in frames and every duplication of a lense should be

accompanied by a prescription from a medical expert." *Id.* at 487. *See* Asheesh Agarwal, *Protectionism as a Rational Basis? The Impact on E-Commerce in the Funeral Industry,* 3 J.L. Econ. & Pol'y 189, 193 (2007).

Thus, *Williams,* the purported lynchpin for the *Powers* decision, does not conclude that economic protection for optometrists or ophthalmologists to the detriment of opticians serves a rational basis; the decision is based on the Court's perception of the law's advancement of a public good. As noted by one commentator, "The Court [in *Williamson*] did not discuss whether it would have upheld the law had its sole effect, or its only reasonably conceivable effect, been to divert business away from opticians and to optometrists and ophthalmologists." *Id.* at 194. At a minimum, all of the cases upon which *Powers* relied looked into the reasons for the legislation; the courts in question looked for a rational basis and in most instances found such.

Based on the foregoing, the Court does not see sufficient support for the *Powers* approach and will not adopt it. The Court sees no basis to create a *per se* rule of law that economic protectionism is a legitimate state interest. As the concurrence in the *Powers* decision states eloquently:

> The majority is correct that courts have upheld regulatory schemes that favor some economic interests over others. Many state classifications subsidize or promote particular industries or discrete economic actors. And it is significant here that Oklahoma's licensing scheme only covered intrastate sales of caskets. But all of the cases rest on a fundamental foundation: the discriminatory legislation arguably advances either the general welfare or a public interest.

*Powers*, 379 F.3d at 1225. "Purely private interest legislation does not protect the general welfare; it treats one group of people differently from another group because of a 'raw exercise

of political power.'" Jim Thompson, *Powers v. Harris: How the Tenth Circuit Buried Economic Liberties*, 82 Denv. U.L. Rev. 585, 599-600 (2005).  Accordingly,

**IT IS ORDERED** that Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) or Alternatively, Motion for Judgment on the Pleadings Pursuant to Rule 12(c) (Doc. 38) is **DENIED**.

With respect to the Motion for Preliminary Injunction, prior to taking up these motions, the Court then held a second status conference.  At that time, it became clear and the parties concurred that the hearing on the Preliminary Injunction shall be advanced to the trial on the merits as contemplated under Rule 65(a)(2).  This matter is set for trial on June 6, 2011 at which time it will take up the merits of this case.  Accordingly,

**IT IS ORDERED** that the Motion for Preliminary Injunction (Doc. 22)  is **CONTINUED** to be heard at the time of trial of this matter, commencing on June 6, 2011.

New Orleans, Louisiana, this 8th day of April, 2011.

**STANWOOD R. DUVAL, JR.**
**UNITED STATES DISTRICT COURT JUDGE**

15