UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ST. JOSEPH ABBEY, ET AL.                    CIVIL ACTION

VERSUS                                       NUMBER: 10-2717

PAUL "WES" CASTILLE, ET AL.                  SECTION:  "K"(5)

**FINDINGS AND RECOMMENDATIONS**

I.      BACKGROUND

        This litigation arose from the St. Joseph Abbey's attempts to sell wooden caskets
made by its monks to the public.  When it learned of the Abbey's efforts, the Louisiana State
Board of Embalmers and Funeral Directors (the "Funeral Board") threatened the monks
with fines and imprisonment for the crime of selling caskets without complying with the
licensure requirements for funeral directors or funeral establishments, as set forth in the
Louisiana Embalming and Funeral Directors' Act, La. Rev. Stat. §§37:831-885 (the "Act").
(Rec. doc. 1 at ¶¶ 36, 42-43).  The Abbey subsequently petitioned the Louisiana Legislature
to amend the law in order to allow entities other than non-licensed funeral directors to sell
caskets to the public.  When those efforts failed to bear fruit, the Abbey and Deacon Mark
Coudrain sued the individual members of the Funeral Board in their official capacity under
42 U.S.C. § 1983, alleging that the licensing requirement for retail casket sales set forth in
the Act was unconstitutional.

In their complaint, the Plaintiffs claimed the statutory prohibitions against the non-licensed sale of caskets violated the monks' right to earn an honest living and their right to equal protection of the law, as guaranteed by the Fourteenth Amendment to the United States Constitution. (*Id.* at ¶¶ 72-78). The Plaintiffs requested (1) declaratory relief that Louisiana's law was unconstitutional and (2) an order enjoining the Funeral Board from enforcing the law against the Abbey and other retailers of caskets. (*Id.*, Prayer for Relief, ¶¶ A-F).

Recognizing they faced the possibility of criminal fines and/or jail time because they were alleged to be violating the law by continuing to sell caskets, the monks of the Abbey moved for a preliminary injunction on September 14, 2010.  (Rec. doc. 22).  The Funeral Board in turn moved for judgment on the pleadings, arguing that the State of Louisiana could legitimately enact a law that served no other purpose than protecting a discrete interest group, such as funeral directors, from economic competition.  (Rec. doc. 38).  This "economic protectionism" argument became the central theme of the litigation.

The District Judge denied Defendants' motion for judgment on the pleadings and consolidated Plaintiffs' motion for preliminary injunction with the trial on the merits (Rec. doc. 59).  After substantial discovery (including a number of disputes that required the intercession of the Magistrate Judge) and pretrial evidentiary motion practice, the matter proceeded to a one-day bench trial.  The District Judge ultimately issued findings of fact and conclusions of law and entered judgment in favor of Plaintiffs.  (Rec. docs. 97, 98).  The Court declared the challenged provisions to be unconstitutional and permanently enjoined the Funeral Board from enforcing those provisions.  (*Id.*).  The Court also awarded Plaintiffs attorneys' fees.  (*Id.*).

The Defendants appealed to the United States Court of Appeals for the Fifth Circuit, where both sides ultimately enjoyed the participation of numerous *amici*. Following oral argument, the Fifth Circuit certified a question of statutory interpretation to the Louisiana Supreme Court under the doctrine of constitutional avoidance. *St. Joseph Abbey v. Castille*, 700 F.3d 154 (5th Cir. 2012). The Louisiana Supreme Court declined to answer the certified question. *St. Joseph Abbey v. Castille*, 106 So.3d 542 (La. 2013). Following the filing by Plaintiffs of a motion to affirm the District Judge's judgment on constitutional grounds, the Fifth Circuit affirmed the judgment (denying the aforementioned motion as moot). *St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir. 2013).

The Defendants timely filed a petition for a writ of certiorari with the United States Supreme Court. The Plaintiffs waived their right to respond. Eventually, the United States Supreme Court denied Defendant's petition, *Castille v. St. Joseph Abbey*, __ U.S. __, 134 S.Ct. 423 (2013), and the Fifth Circuit awarded attorneys' fees to Plaintiffs for the appeal. (Rec. doc. 117). This fee application followed. (Rec. doc. 121).

II.    STANDARD OF REVIEW

The analysis to be undertaken by this Court in evaluating the plaintiffs' fee application is well-established: the "most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939 (1983). The product of this calculation is called the lodestar. *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir.), *cert. denied sub nom*. 516 U.S. 862, 116 S.Ct. 173 (1995). There is a "strong" presumption that the lodestar calculation produces a

3

reasonable fee. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552, 130 S.Ct. 1662, 1673 (2010).

Once the lodestar has been determined, the Court must then consider the applicability and relative weight of the twelve factors set forth in *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717-19 (5th Cir.1974).[1] While the Court may make upward or downward adjustments to the lodestar figure if the *Johnson* factors so warrant, the lodestar is presumptively correct and should be modified only in exceptional cases. *See Watkins v. Fordice*, 7 F.3d 453 (5th Cir.1993).

After calculation of the lodestar, the burden shifts to the party opposing the application to contest the reasonableness of the hourly rate requested and/or the reasonableness of the hours expended ". . . by affidavit or brief with sufficient specificity to give [the] fee applicants notice . . ." of those objections. *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3rd Cir. 1990).

III.   ANALYSIS

### A.  Reasonable Hourly Rate

The benchmark of a reasonable hourly rate is the prevailing rate in the relevant legal market. *Hensley*, 461 U.S. at 447, 103 S.Ct. at 1946-47 (1983). This is true even in cases where, as here, an attorney or firm offers representation *pro bono*. *Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 1547 (1984) (holding that fee awards under Section 1988 ". . . are to be calculated according to the prevailing market rates in the relevant

---

[1]  The twelve *Johnson* factors are:  (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the attorney due to this case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations; (8) the amount involved and results obtained; (9) the experience, reputation, and ability of counsel; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and, (12) awards in similar cases. *See Johnson*, 488 F.2d at 717-719.

community, regardless of whether plaintiff is represented by private or nonprofit counsel"). This rationale provides civil-rights plaintiffs with an opportunity ". . . to vindicate their rights by providing compensation sufficient to attract competent counsel." *McClain v. Lufkin Indus., Inc.*, 649 F.3d 374, 381 (5th Cir.), *cert. denied*, __ U.S. __, 132 S.Ct. 589 (2011); *see also Perdue*, 559 U.S. at 552, 130 S.Ct. at 1672 ("a 'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case."); *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565, 106 S.Ct. 3088, 3098 (1986) ("[I]f plaintiffs ... find it possible to engage a lawyer based on the statutory assurance that he will be paid a 'reasonable fee,' the purpose behind the fee-shifting statute has been satisfied").

In determining the prevailing market rate for these purposes, locale alone is not determinative; the Court must also endeavor to compare the requested rates to those prevailing in the relevant legal market ". . . for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum*, 465 U.S. at 895 n. 11, 104 S.Ct. at 1547 n. 11. Indeed, "considerations concerning the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate." *Perdue*, 559 U.S. at 553, 130 S. Ct. at 1673 (internal quotation omitted).

The applicant bears the burden of producing satisfactory evidence that the requested rate is aligned with prevailing market rates. *NAACP v. City of Evergreen, Alabama*, 812 F.2d 1332, 1338 (11th Cir. 1987). Such satisfactory evidence of the reasonableness of the rate necessarily includes an affidavit of the attorney performing the work and, if available, information on rates actually billed and paid in similar lawsuits. *Blum*, 465 U.S. at 896 n. 11, 104 S.Ct. at 1547 n. 11. However, mere testimony that a given

fee is reasonable is not satisfactory evidence of market rate.  *See Hensley*, 461 U.S. at 439 n.

15, 103 S.Ct. at 1942 n. 15.

Evidence of rates may be adduced through direct or opinion evidence as to what

local attorneys charge under similar circumstances.  *Gulf Coast Facilities Management, LLC*

*v. BG LNG Services, LLC*, No. 09-CV-3822, 2010 WL 2773208 at *3 (E.D. La. July 13, 2010)

(Roby, M.J.).  The weight given to such opinion evidence by the Court should depend upon

the detail contained in the testimony or expert declaration on matters such as similarity of

skill, reputation, and experience; similarity of case and client; and breadth of the sample of

which the expert has knowledge.  *Id.* (*citing Norman v. Hous. Auth. of City of Montgomery*,

836 F.2d 1292 (11th Cir.1988)).

With these standards in mind, the Court turns to the specific hourly rates requested

by Plaintiffs in this matter.

1.  Attorneys and Paralegals with the Institute of Justice

With the exception of local counsel, F. Evans Schmidt, all of the attorneys and

paralegals for whose time Plaintiffs seek to recover here are associated with the Institute

for Justice (the "Institute"), a non-profit, public-interest law firm based in Washington D.C.

that represents clients in constitutional litigation on a *pro bono* basis.  Declaration of Scott

G. Bullock ("Bullock Decl."), at ¶¶ 17-20 (Rec. doc. 121-2).  The Institute became involved in

this matter when its lawyers were contacted by Mr. Schmidt, who was searching for a firm

with constitutional litigation experience that would be willing to represent the Abbey and

Deacon Coudrain on a *pro bono* basis.  Declaration of F. Evans Schmidt, at ¶¶ 4, 5 (Rec. doc.

121-14).

According to Plaintiffs' counsel, Scott G. Bullock, the litigation was staffed throughout by Mr. Bullock as lead counsel, Jeff Rowes as second chair, and one paralegal at a given time.  Bullock Decl. at ¶¶ 24-26.  Once the case entered the discovery phase, the Institute added attorney, Darpana Sheth, to the litigation team.  *Id.* at ¶ 27.  A paralegal, Rebekah Ramirez, was assigned to the case initially, but when Ramirez moved to Florida, the Institute assigned senior paralegal Gretchen Embry to take her place.  *Id.* at ¶ 28.

Plaintiffs maintain that, while they would be entitled under the circumstances of this case to recover fees based upon prevailing rates in the Washington D.C. area (where the Institute is based), in an effort to avoid a "second major litigation"[2] over attorneys' fees in this matter, they are seeking only to recover the prevailing rates in the forum district, New Orleans.[3]  The fees being sought by the Institute's attorneys and paralegals are as follows:

| NAME | TITLE | YEARS OF EXPERIENCE | REQUESTED RATE |
|------|-------|---------------------|----------------|
| Scott G. Bullock | Senior Attorney | 22+ | $500 |
| Jeff Rowes | Senior Attorney | 11+ | $375 |
| Darpana M. Sheth | Attorney | 9+ | $300 |
| Gretchen Embry | Senior Paralegal | 17+ | $150 |
| Rebekah Ramirez | Paralegal | 6+ | $100 |

In support of their request, each of the aforementioned individuals submitted a declaration, setting forth their respective qualifications, years of experience, the nature and

---

[2] *Hensley*, 461 U.S. at 437, 103 S.Ct. at 1941.

[3] (Rec. doc. 121-1 at p. 10).  There was some question at the evidentiary hearing whether Plaintiffs were continuing to press their "entitlement" to Washington D.C. rates.  When asked directly by the Court whether that was the case, Mr. Bullock expressly stated that Plaintiffs were not seeking such rates and were content to seek New Orleans rates.  This Court will therefore forego any discussion whether Plaintiffs might have been entitled to Washington D.C. rates.

extent of the work they each did in this case, the hourly rate they charged, and the number of hours they each billed in the case.[4] (Plaintiffs' Exhibits 1-5, accepted into the record at the evidentiary hearing).  Attached to each declaration are detailed "time sheets" setting forth in line-by-line fashion the tasks undertaken by each attorney, the date that work was done, the "actual hours" worked on each task, and the "time requested" as to each task. (*Id.*).

In addition to these declarations, Plaintiffs also submitted the declaration of James R. Swanson, a senior New Orleans litigator retained by Plaintiffs as an expert witness in connection with this fee application.  (Plaintiffs' Exhibit 7).  Mr. Swanson's report and testimony pertained only to the question of reasonable hourly rates.  Finally, the Plaintiffs submitted two memoranda of law in support of their application.  (Rec. docs. 121, 140).

In opposition to Plaintiffs' application, Defendants submitted two memoranda of their own, along with a report, in letter form, of their own expert, James M. Garner, like Mr. Swanson an experienced New Orleans litigator.[5]  Unlike Mr. Swanson, Mr. Garner's report and testimony took issue, not only with the rates requested by Plaintiffs' counsel, but with the number of hours billed as well.

Having considered all of these materials submitted in support of the parties' respective positions, the Court makes the following findings as to the appropriate rate for each individual attorney.

---

[4] Mr. Schmidt also submitted such a declaration, which is discussed below.

[5] Both expert "reports" were offered and accepted into evidence.  Defendants lodged certain objections to Mr. Swanson's declaration at the evidentiary hearing, all of which were overruled, save two.  Defendants' objection to Mr. Rowes' second declaration, submitted in connection with Plaintiffs' reply memorandum, was mooted because Plaintiffs withdrew that declaration and did not seek to offer it into evidence.  Defendants' objection to references in Mr. Bullock's declaration to hearsay in the form of a survey of attorneys' fees published by the National Law Journal was taken under advisement by the Court.  That objection is hereby overruled.  It should be noted, however, that the Court has not relied and is not relying on that information as a basis for any finding herein.

a.  *Scott R. Bullock*

Mr. Bullock is a 1991 graduate of the University of Pittsburgh's School of Law and is a member of the District of Columbia Bar and the bars of the Supreme Court of the United States and the United States Courts of Appeals for the Fourth, Fifth, Sixth, Eighth, and District of Columbia Circuits.  (Rec. doc. 121-2 at ¶¶ 1-6).  He joined the Institute upon graduation in 1991 and was promoted in 1999 to senior attorney.  (*Id.* at ¶¶ 4, 5, 7).  He specializes in constitutional litigation with a particular focus on matters involving property rights, economic liberty, and free speech in both federal and state courts throughout the country.  (*Id.* at ¶ 7).

Germane to this case, in the arena of economic liberty, Mr. Bullock has taken a lead role in developing the Institute for Justice's strategy to challenge infringements on the right to earn an honest living.  (*Id.* at ¶ 11).  He has been lead counsel in a number of cases successfully challenging licensing requirements for various entry-level occupations, such as barbers, hair-braiders, and equine massage therapists and defended efforts to open up taxi markets to more competition before the U.S. Court of Appeals for the Sixth Circuit.  (*Id.*).

Mr. Bullock has regularly published opinion pieces on constitutional law in national print media including The New York Times and The Wall Street Journal, and has appeared on national broadcast media as an expert on constitutional law, including 60 Minutes, National Public Radio, and ABC Nightly News.  (*Id.* at ¶ 13).

In 2002, he was awarded the Drum Major for Justice Award by the Southern Christian Leadership Conference for the Protection of Private Property Rights in Mississippi and in 2005, he was awarded the Outstanding Institute for Humane Studies Alumni.  (*Id.* at ¶¶ 14-15).

Mr. Bullock requests an hourly rate of $500.  His requested rate is supported by his own declaration and that of Plaintiffs' expert, Mr. Swanson.  (Rec. doc. 121-16).  Mr. Swanson stated in his declaration and testified (and the Court is well aware) that he is a *magna cum laude* graduate of Tulane Law School and that he has practiced law for 26 years, with over 100 reported decisions.  (*Id.*).  While practicing primarily in the area of commercial litigation, he is often engaged in matters that involve questions of constitutional law, both federal and state.  (*Id.*).

In Mr. Swanson's stated opinion, the rates requested by the Institute's lawyers and paralegals are reasonable and compatible with the rates that would be charged by New Orleans law firms (including his) for work done by lawyers with comparable experience and credentials.  (*Id.*).  Mr. Swanson testified that he himself would charge the same $500/hour rate for constitutional litigation that Mr. Bullock requests for himself in this case – a fact this Court finds notable because Defendant's expert, Mr. Garner, identified Mr. Swanson as one of a handful of local attorneys who "is fully capable of handling cases involving constitutional challenges." (Rec. doc. 137-1 at p. 4).

On behalf of Defendants, Mr. Garner takes issue with the rates requested by all of the Institute's attorneys and paralegals in this case, including Mr. Bullock.  An accomplished and able attorney who is well known to this Court and to the New Orleans bar, Mr. Garner opines in this matter that a reasonable hourly rate for Mr. Bullock is $350 and that his requested rate of $500 is "excessive." (Rec. doc. 137-1 at p. 4).  He bases this opinion on his "experience and practice as both a manager of a New Orleans law firm and a practicing attorney for twenty-five years." (*Id.*).

While Mr. Garner testified that his firm would charge a rate of $350 for <u>his</u> time in this case, he also suggested that there were a handful of other specific law firms in this area "fully capable"[6] of handling constitutional challenges, one of which is Mr. Swanson's firm, which, according to Mr. Swanson's sworn testimony, would have charged a $500 hourly rate for his time in this case.  Indeed, Mr. Garner conceded in his testimony that he previously opined in this district that a rate of $575 per hour was "reasonable and consistent with the rates charged by other local attorneys with similar experience, skill and reputation" as the 1992 law school graduate on whose behalf he was testifying (Mr. Bullock is a 1991 graduate).  *See Gulf Coast Facilities Management, LLC*, 2010 WL 2773208 at *4.[7] He likewise acknowledged that he himself charges up to $425 an hour for "complex commercial" litigation.  [Testimony at p. 9].

In sum, the declarations and testimony of the parties' experts (in this case and others) seem to put the prevailing rate for senior-level partners somewhere in the range of $350 to $575 per hour – a wide range indeed.  The weight the Court gives such opinion testimony or declarations should depend upon the detail contained therein on matters such as similarity of skill, reputation, and experience; similarity of case and client; and, breadth of the sample of which the expert has knowledge.  *Gulf Coast Facilities Management, LLC,* 2010 WL 2773208 at *3 (*citing Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292 (11th Cir.1988)).  In this regard, and perhaps owing to the somewhat unique nature of this case, the Court finds the testimony of both experts somewhat lacking in the foregoing areas

---

[6]  Plaintiffs' decision not to seek Washington D.C. rates makes it ultimately unnecessary for this Court to decide whether a given local firm's "capability" of handling a case <u>like</u> this one equates in any meaningful way to its being a reasonable alternative to the Institute, with its acknowledged breadth of both experience and success in this very specie of constitutional litigation.

[7]  In that dispute over attorneys' fees in connection with a motion to compel, Mr. Garner "testified" only by affidavit.  (No. 09-CV-3822, rec. doc. 159-2, pp. 11-12).

of detail.  Accordingly, while affording some weight to their respective opinions, the Court also looks to its independent research, along with its own experience and knowledge of the local legal market, and finds that the requested rate of $500 for Mr. Bullock is only somewhat excessive.  Five years ago, for instance, the Chief Judge of this district found that "the top rate for partner-level attorneys here is between $400 and $450 per hour."  *Oreck Direct, LLC v. Dyson, Inc.*, No. 07-CV-2744, 2009 WL 1649503 at *4 (E.D. La. June 8, 2009) (Vance, J.).  This Court's experience in the local market bears that out.  Considering that the lion's share of the work in this case was undertaken very near in time to Judge Vance's finding in *Oreck Direct*, the Court finds that a reasonable hourly rate for Mr. Bullock, with his experience and expertise, is $450 per hour.

For multiple reasons, the Court finds that Mr. Bullock (and the remainder of the Institute attorneys and paralegals) are entitled to recover an hourly rate at the top end of the range of prevailing rates in this market.  Chief among those reasons is the Court's belief that the Institute and its lawyers possess a level of expertise in cases such as this that is at least commensurate with that possessed by the cream of the New Orleans bar.  Added to this expertise is the Institute's willingness to take on a case like this on a *pro bono* basis, despite having to negotiate what even Mr. Garner conceded was the "highest burden" in constitutional litigation.  [Testimony at pp. 18-19].

While Mr. Garner did suggest a number of firms "capable" of handling a case like this one, he did not speak to whether he thought any of these law firms would have accepted the representation of the Abbey in this rational basis case on a *pro bono* basis, with no promise at all of any remuneration.  The Court is extremely skeptical that any of the local firms listed by Mr. Garner (or any other "capable" local firm for that matter), would have

taken this case under such an arrangement.  Indeed, local counsel Mr. Schmidt stated in his declaration that he "doubted that a local firm in New Orleans would have had the experience and expertise to represent Saint Joseph Abbey in a constitutional challenge or been able to represent them on a *pro bono* basis."  (Rec. doc. 121-4 at ¶ 5).  The Court shares that doubt.

For these reasons, the Court finds that a rate at the top end of the prevailing range is appropriate for Mr. Bullock and the other attorneys of the Institute.  As for Mr. Bullock, the Court recommends an hourly rate of $450.

b.  *Jeff Rowes*

According to his declaration, Mr. Rowes graduated with honors from Harvard Law School in 2002 and holds a Master's Degree from the University of Chicago in law and philosophy.  (Rec. doc. 121-6 at ¶ 3).  After graduating, Mr. Rowes clerked for two years for the Honorable Patricia Fawsett, then Chief Judge of the U.S. District Court for the Middle District of Florida, and subsequently clerked for one year for the Honorable William Garwood of the U.S. Court of Appeals for the Fifth Circuit.  (*Id.* at ¶¶ 4, 5).

Mr. Rowes joined the Institute for Justice as a staff attorney and was promoted to a senior attorney in 2009, specializing in constitutional litigation, particularly in the areas of freedom of speech, property rights, and economic liberty.  (*Id.* at ¶¶ 6-8).  He has handled numerous complex constitutional cases in federal courts throughout the country.  (*Id.* at ¶¶ 9-12).

Mr. Rowes served as second chair from the inception of this litigation and is requesting an hourly rate of $375 in this fee application.

As with Mr. Bullock, the request for Mr. Rowes' fee is supported by the declaration and testimony of Mr. Swanson, who opined that his firm would charge $375 per hour for partners with similar credentials and experience.  (Rec. doc. 121-16 at ¶ 8).  Conversely, Mr. Garner, despite suggesting Mr. Swanson's firm as one local alternative to the Institute in this matter, opined that Mr. Rowes' requested rate is "excessive," suggesting a more "reasonable" hourly rate of $225.  (Rec. doc. 137-1 at pp. 4- 5).

As was the case with Mr. Bullock, neither expert provided much detail in the way of supporting their respective positions, other than to offer the hourly rates they claim their firms would charge for attorneys of similar tenure at the bar.  Mr. Garner testified that for a junior partner with similar experience as that of Mr. Rowes, his firm charges $150 to $315 per hour.  [Testimony at pp. 13-14].  Mr. Swanson testified generally that his firm actually charges approximately $290 to $350 per hour for similarly experienced lawyers but that it would have charged the requested hourly rate of $375 in <u>this</u> case for a similarly experienced and credentialed lawyer.  (Rec. doc. 121-16 at ¶ 8).

Standing alone, the experts' testimony and declarations establish a top rate for New Orleans attorneys of Mr. Rowes' experience of $315 to $375.  However, despite Mr. Rowes' impressive credentials and what this Court finds to be extensive experience for a lawyer of his tenure, the Court nonetheless believes, based on both the experts' testimony and its own experience in and knowledge of this market, that an hourly rate of $375 is outside the prevailing hourly rate for a junior partner in New Orleans and finds that a more reasonable hourly rate for Mr. Rowes is $335.  This rate is, in the Court's view, at the top end of the range of prevailing rates for a lawyer of Mr. Rowes' experience and credentials, crediting

14

not only his time with the Institute but also his two federal clerkships. Accordingly, the Court will recommend an hourly rate of $335 for Mr. Rowes.

### c. *Darpana Sheth*

Ms. Sheth graduated from Georgetown University Law Center in 2001 and worked for the next three years, as a litigation associate in the Manhattan law firm of Chadbourne & Parke, LLP. (Rec. doc. 121-8 at ¶¶ 3-4). After receiving an LL.M. at American University Washington College of Law, she clerked for the Honorable Jerome A. Holmes of the U.S. Court of Appeals for the Tenth Circuit. (*Id.* at ¶ 5). She served for over a year as Assistant Attorney General for the State of New York before joining the Institute in February 2010 as an attorney. (*Id.* at pp. 6-7).

As an attorney with the Institute, Ms. Sheth specializes in constitutional litigation, particularly regarding protection of property rights and economic liberty, and she practices in federal courts throughout the country. (*Id.* at ¶ 8).

Ms. Sheth was assigned to this litigation by lead counsel, Mr. Bullock, in January 2011, as the case entered the discovery phase. (Rec. doc. 121-2 at ¶ 27). According to Mr. Bullock, Ms. Sheth was primarily responsible for drafting and responding to written discovery; reviewing numerous complaints produced by the Funeral Board; conducting third-party discovery; and, taking the lead on all issues (in discovery and pretrial) related to past casket sales by the Abbey and the monks' assertion of their Fifth Amendment privilege against self-incrimination. (*Id.* at ¶ 29). In addition, Ms. Sheth deposed one of the Funeral Board's expert witnesses, Mr. Foster Guillory, and took the initial lead on preparing the joint pre-trial order. (*Id.*).

As to Ms. Sheth's requested hourly rate of $300, the parties' experts predictably disagree. Suffice to say that Mr. Swanson for Plaintiffs testified and declared that his firm would charge $300 per hour in this case for an attorney of Ms. Sheth's experience and credentials, while Mr. Garner pegged a reasonable hourly rate for Ms. Sheth at $200. The Court finds somewhat notable the fact that Ms. Sheth graduated from law school the same year as Mr. Rowes, but claims less experience because she subsequently sought an LL.M. degree after practicing for three years. For this reason, both experts suggest an hourly rate for her lesser than that they believe appropriate for Mr. Rowes.

The Court agrees that a lesser rate is appropriate for Ms. Sheth than for Mr. Rowes but declines to reduce her requested hourly rate of $300. Ms. Sheth is impressively credentialed and has a breadth of experience that would place her at or near the top echelon of similarly tenured lawyers in New Orleans. Based upon the parties' experts' submissions and this Courts' own knowledge of the rates charged for similarly experienced and credentialed attorneys in New Orleans, the Court finds that an hourly rate of $300 for Ms. Sheth is reasonable and will recommend such a rate in connection with this application.

### d. Rebekah Ramirez and Gretchen Embry

Ms. Ramirez was the paralegal originally assigned to this matter by the Institute. When she moved to the Institute's Florida chapter in 2011, Mr. Bullock assigned Ms. Embrey to replace her. (Rec. doc. 121-2 at ¶ 28).

Plaintiffs seek an hourly rate of $100 for Ms. Ramirez and $150 for Ms. Embrey. Mr. Garner opined that, while "high for her level of experience," Ms. Ramirez's requested rate is not excessive. The Court agrees and will recommend that rate for Ms. Ramirez. As to Ms. Embrey, who has been with the Institute since 1996, Mr. Garner suggests that $150 per

hour is too high in this market and that an hourly rate of $125 is more reasonable.  (Rec. doc. 137-1 at p. 5).  Notwithstanding Mr. Swanson's declaration that his firm would charge $150 per hour for a paralegal of Ms. Embrey's experience, the Court agrees with Mr. Garner that an hourly rate of $125 in the New Orleans market is more in line with her experience and will recommend that rate in connection with this application.[8]

2.   *F. Evans Schmidt*

Mr. Schmidt is local counsel for Plaintiffs who was instrumental in enlisting the services of the Institute to represent Plaintiffs in this matter.  Under the Local Rules of this district, Plaintiffs were required to and did retain Mr. Schmidt on this case as responsible local counsel.  L.R. 83.2.5.

While Defendants do object to some extent to the level of Mr. Schmidt's participation in the case, as reflected in the number of hours billed by him, they do not object to his requested hourly rates, which are as follows:  $200 (2010); $210 (2011); $225 (2012); and, $225 (2013).  Accordingly, the Court recommends these rates for Mr. Schmidt.

**B.   Determining the Reasonable Hours Expended**

To determine the lodestar, the Court must multiply the reasonable hourly rates by the reasonable number of hours expended in the matter.  *Wegner v. Standard Insurance Co.,* 129 F.3d 814, 822 (5th Cir. 1997).  This calculation requires not only a determination of whether the total number of hours claimed were reasonable but also whether the particular hours claimed were reasonably expended.  *Id.*  It is the applicant's burden to

---

[8]  Defendants' counsel (but not their expert) argued at the evidentiary hearing and in brief that, because Plaintiffs failed to provide proof that either Institute paralegal is "certified," Plaintiffs should recover nothing for their time.  They point to no authority that supports the notion that law firms in this market do not or cannot bill for paralegal tasks if the person undertaking those tasks is not "certified" and this Court is not aware of any.  On the contrary, the Court knows that law firms routinely bill their clients for paralegal work done by "uncertified" paralegals and that clients invariably pay for that work.  Accordingly, the Court rejects this argument.

present adequate documentation of the hours reasonably expended.  *Id.* (*citing Louisiana Power and Light Co.*, 50 F.3d at 324).

As a threshold matter, the Court finds that the Plaintiffs have adequately documented the hours expended for which they seek to recover.  Each attorney and paralegal individually submitted detailed time sheets with a description of the work done, the number of hours expended, the number of hours claimed, and supporting declarations. (Rec. docs. 121-2 through 15).  In addition, Mr. Bullock submitted a lengthy declaration explaining how those time sheets were compiled and how and why a number of hours that were actually expended were eliminated from the fee request.  (Rec. doc. 121-2).  Finally, Plaintiffs filed two memoranda and an expert declaration in support of their fee application that further explained and supported their request.

The Fifth Circuit has approved fee applications with much less robust documentation.  For instance, in *Wegner*, the Court reviewed documentation it considered "marginal at best" because it lacked "any time sheets or descriptions of the work done." *Wegner*, 129 F.3d at 822-23.  Despite these arguable shortcomings, the Court declined to find the documentation ". . . so vague and incomplete that the district court was precluded from conducting a meaningful review whether the hours claimed" were reasonable.  *Id.*; *see also Clearvalue, Inc. v. Pearl River Polymers, Inc.*, 560 F.3d 1291, 1305 (Fed. Cir. 2009).  The Court finds that Plaintiffs in this case have easily met their burden to provide documentation enabling it to conduct a meaningful review of their request, which the Court has, in fact, undertaken.

Turning then to the reasonableness of the hours claimed, the Court is guided in large part by the notion that "the result is what matters."  *Hensley*, 461 U.S. at 435, 103 S.Ct. at

1940.  Here, the Court perceives not a single material issue upon which Plaintiffs ultimately did not prevail, despite vigorous opposition from Defendants throughout the litigation and having to overcome one of, if not the most, daunting burdens in the law, the rational basis test.

> Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee.  Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified.

<em>Hensley</em>, 461 U.S. at 435, 103 S.Ct. at 1940.

It simply cannot be seriously argued that Plaintiffs in this case achieved anything other than an excellent result here; it follows they are entitled to a fully compensatory fee.

The Court has already discussed the requirements for documenting a fee request such as this and found Plaintiffs' documentation sufficient.  The next inquiry then is whether counsel exercised "billing judgment."  Here, the Court looks to whether Plaintiffs' counsel discharged their obligation to "make a good faith effort to exclude from [their] fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission."  *Id.* at 434, 103 S.Ct. at 1939-40.

In this matter, Plaintiffs argue they have exercised such billing judgment and have explained how they have done so in detail.  In their memoranda in support of their fee application and in each attorney's declaration in support thereof, the Institute's attorneys explain both the nature and amount of time they each deducted or eliminated from their respective time sheets.  Mr. Bullock explains in his declaration that, in total, the Institute

eliminated over 1,000 hours of time actually expended by its attorneys and paralegals from Plaintiffs' fee application.  (Rec. doc. 121-2 at ¶ 70).

Predictably, Defendants are unsatisfied with this downward adjustment.  Indeed, Mr. Garner even posits that "such an adjustment would, in many cases, justify a closer review" of counsel's time sheets and the descriptions of work contained therein.  (Rec. doc. 137-1 at p. 7).  The Court interprets this statement as suggesting that that the more vigorous the downward adjustment by a fee applicant in an effort to demonstrate billing judgment, the more suspect the application.  While the Court believes this circular argument to be inconsistent with the principle of billing judgment, it has nonetheless undertaken a "closer review" of the Institute's and Mr. Schmidt's time sheets.

That review convinces the Court that Plaintiffs did, indeed, exercise an acceptable level of billing judgment.  While the Court does not believe an exhaustive analysis supporting its conclusion is necessary here, a number of facts bear mention.  First and foremost is the rather obvious conclusion that Plaintiffs, much more so than Defendants, took heed of the Supreme Court's admonition that a "[a] request for attorney's fees should not result in a second major litigation."[9]  Unfortunately, such a second litigation has most assuredly arisen here, due in no small part to Defendants' rather relentless opposition to Plaintiffs' fee application.  Notably, a formal mediation on the fee application was held (without success), expert reports were exchanged, two rounds of briefing took place, and a formal evidentiary hearing was held before this Court.  More notably, Plaintiffs seek neither fees nor costs for any of that work in their application, despite being entitled under the law to do so.  *See, e.g., Knighton v. Watkins*, 616 F.2d 795, 800 (5th Cir.1980).  Likewise, the

---

[9] *Hensley*, 461 U.S. at 437, 103 S.Ct. at 1941.

Court's review of Plaintiffs' time sheets and supporting declarations reveals that counsel eliminated all time spent in consideration of Defendants' petition for writ of certiorari to the United States Supreme Court; eliminated all time accrued by Institute attorneys not part of the core litigation team; and, substantially reduced travel time.[10]

These adjustments are emblematic of the billing judgment exercised by the Plaintiffs and, along with the Court's line-by-line review of the submitted time sheets, lead the Court to conclude that, with one limited exception, no further downward adjustment is merited. The only adjustment this Court finds necessary and appropriate is with respect to time spent on a "judicial research project" that both sides agree should be reduced to 10 hours. (Rec. doc. 140 at n. 6).

Otherwise, the Court finds that Plaintiffs have more than sufficiently demonstrated: (1) that they exercised appropriate billing judgment in finalizing their application, (2) that they appropriately staffed the case and, (3) that the tasks for which they seek remuneration were reasonably undertaken in this case. The Court makes these findings having closely considered Defendants' specific complaints regarding these issues and having reviewed the Plaintiffs' submissions line-by-line against those complaints or criticisms, the procedural history of the case, and the results obtained by Plaintiffs. Accordingly, the Court finds that the lodestar in this case is $844,795.24.[11]

---

[10]  The Court declines to reduce the Institute's travel time any further, as Defendants suggest it should, on the basis that it was unnecessary for Plaintiffs to look outside New Orleans for representation. The totality of the circumstances and the record in the case convince the Court that it was reasonable for Plaintiffs to engage the services of the Institute in this matter.

[11]  This figure is computed as follows:  Mr. Bullock – 615.75 hours at $450/hour totaling $277,087.50.  Mr. Rowes – 817 hours at $335/hour totaling $273,695.  Ms. Sheth – 780.75 hours at $300/hour totaling $234,225.  Ms. Embrey – 71.5 hours at $125/hour totaling $8,937.50.  Ms. Ramirez – 233.5 hours at $100/hour totaling $23,350.  The Institute's total lodestar is $817,295.  Added to this figure are Mr. Schmidt's total fees of $27,500.24

## C.  *Determining Whether to Adjust the Lodestar under* Johnson

With the lodestar determined, the Court considers the applicability and relative weight of the 12 *Johnson* factors.[12]   While the Court may make upward or downward adjustments to the lodestar figure if the *Johnson* factors so warrant, there is a "strong" presumption that the lodestar is correct and it should be modified only in exceptional cases.  *Perdue,* 559 U.S. at 552, 130 S.Ct. at 1673.  As to any downward adjustments requested by Defendants, the burden falls to them to demonstrate "by affidavit or brief with sufficient specificity" the nature of the requested adjustments and the grounds for asserting their necessity.  *See Rode*, 892 F.2d at 1183.[13]

Defendants have indeed argued for numerous downward adjustments in this case, relying in large part on the declaration and testimony of Mr. Garner.  After careful review of the Defendants' arguments and Mr. Garner's testimony and declaration, the Court finds that Defendants' arguments in this regard are simply not supported by the record.[14]   For the following reasons, using the same rubric as that employed by Mr. Garner, the Court finds that no additional downward adjustments to Plaintiffs' counsel's time sheets are warranted.

### 1.  *Staffing of the Case*

Defendants rather boldly complain that Plaintiffs over-lawyered this case by using three attorneys plus local counsel (whose total fees billed were less than $30,000). Plaintiffs very aptly observe that throughout this litigation, Defendants deployed no less than seven attorneys on their behalf.   It is difficult to take seriously an overstaffing

---

[12] *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717-19 (5th Cir.1974).

[13]  Plaintiffs have not requested any upward adjustment and none shall be recommended.

[14]  While the Court does not believe that expert testimony is necessary with regard to this particular inquiry, it has nonetheless taken into account the detailed declaration and testimony of Defendants' expert.

complaint emanating from such a robust litigation team.  Indeed, at the April 10, 2014 status conference held by this Court in connection with the current fee application, Defendants had five lawyers in attendance to Plaintiffs' two (and Plaintiffs are not seeking fees for the attendance of those two).

Plaintiffs, by way of Mr. Bullock's declaration, explained in detail how and why the case was staffed the way it was and the Court finds that explanation more than sufficient. The Defendants' arguments in this regard are without merit.[15]

### 2.  The Institute's Experience in Similar Litigation

Defendants argue in brief that the considerable experience the Institute for Justice brings to such cases militates against awarding Plaintiffs' the fees they request.  The Court agrees that the Institute's attorneys in this case do possess considerable experience and expertise in constitutional matters, but is unaware of any authority (and none is cited) that would require the Court to discount the amount of time they spent litigating *this* case.  In fact, while Defendants' argument appears to invoke the first *Johnson* factor – the time and labor required for the litigation – it simultaneously ignores the third factor – the skill required to perform the legal services properly.

Plaintiffs and their counsel faced an aggressive and thorough defense throughout this litigation and even if, as Defendants argue, "the path to the result reached in this case was well-worn and well-marked," it is equally true that the result was well-earned.  The Court declines to make a downward adjustment based upon the Institute's expertise or prior experience in similar litigation.

---

[15]  Defendants suggest it was unnecessary for Plaintiffs to retain local counsel on the case after the Institute appeared on their behalf, but the Local Rules of this District required that local counsel remain in the case.  LR 83.2.5.

### 3.  Preliminary Investigation/Drafting of the Complaint

Defendants' suggestion that Plaintiffs' counsel expended too much time in the preliminary phase of the case ignores the heavy burden Plaintiffs had to carry in order to prevail.  This was a "rational basis" case, meaning Plaintiffs had to negate every conceivable basis for the underlying statutory regime, even those not raised by Defendants.  Given the obstacles counsel knew they would have to negotiate to prevail, the time expended by them in this initial phase was reasonable.

### 4.  Preliminary Injunction Motion

The Court also disagrees with Defendants that Plaintiffs' counsel expended too much time litigating the Abbey's motion for preliminary injunction.  That motion, which the District Judge consolidated with the trial on the merits, required consideration of numerous complex issues of law and was vigorously contested by Defendants, who filed a sur-reply for their own part (rec. doc. 46) and who were joined in opposing the motion by the Attorney General's Office, which filed its own opposition memorandum.  (Rec. doc. 31). Under the circumstances, the Court finds the time expended on this effort to be reasonable.

### 5.  Opposing Defendants' Motion to Dismiss

While the parties do not dispute that the issue at the heart of Defendants' motion to dismiss was one of first impression in this circuit, Defendants nonetheless take issue with the 54.1 hours expended by Plaintiffs' counsel in opposing it.  Having reviewed these pleadings on its own, the Court is fully satisfied that this time was reasonably expended.

### 6.  Discovery Efforts

Defendants complain that Plaintiffs' counsel expended an unreasonable amount of time on certain tasks during the discovery phase of the case, most particularly opposing a

motion to compel filed by them and preparing for and taking the deposition of defense expert, Todd Van Beck.

Regarding the opposition to the motion to compel (rec. doc. 54), the Court finds the time expended by counsel was reasonable, given the burden of proof faced by Plaintiffs, the breadth of the material sought in the subject discovery, and the ultimate result of that motion.  That Plaintiffs agreed after briefing was complete to turn over *some* disputed material does not mean their efforts opposing the motion were unjustified – the record reflects that the Magistrate Judge denied Defendants' efforts to obtain other of the disputed information.

As for the time expended on Mr. Van Beck's deposition, while it was substantial, the Court finds Plaintiffs' explanation for that time satisfactory.  In this regard, the Court finds it notable that Defendants chose not to call Mr. Van Beck – their own expert witness – to testify at trial, a decision apparently motivated at least in part by Plaintiffs' counsel's efforts before and during his deposition.

*7.  Pre- and Post-trial Briefing*

Defendants complain about the number of hours expended by counsel on two successful motions in limine (rec. docs. 81, 82) and Plaintiffs' post-trial briefs, without providing any specific bases for those complaints.  The Court has reviewed the subject motions and briefs and finds the time billed to those tasks to have been reasonably expended.

*8.  Appeal and Motion to Affirm on Constitutional Grounds*

Defendants argue, through Mr. Garner, that the hours devoted to appeal by the Institute were "grossly excessive," but fail to provide any reason for that conclusion.

25

Likewise, Defendants argue that all time devoted to Plaintiffs' motion to affirm on constitutional grounds should be eliminated, again without explaining why.

As to the appeal, the Plaintiffs argue that the time expended was reasonable:

> the Institute had to address constitutional questions of first impression in this circuit about which there was a split. Both sides marshaled *amicus* parties, which included the nation's leading funeral consumer groups, scholars, the Federal Trade Commission, and the Louisiana funeral-directors lobby. The Institute had to refute at least half a dozen "conceivable" justifications for the law proposed in the proceedings below, and, as part of extensive oral argument preparation, try to hypothesize any other justifications that might spring to the panel's mind. Three days before oral argument, the Fifth Circuit directed the parties to prepare to argue the implications of the just-then issued U.S. Supreme Court decision in *Armour v. City of Indianapolis*, 132 S. Ct. 2073 (2012), in which the plaintiffs lost a rational-basis case six to three. Under these circumstances, it was reasonable to spend considerable time developing, writing, and honing briefs, as well as preparing for argument.

(Rec. doc. 140 at p. 8).

The Court has thoroughly reviewed the record with regard to the Plaintiff's efforts on appeal and agrees with Plaintiffs that their counsel's efforts and the time expended in this endeavor were reasonable.

The same is true of the motion to affirm on constitutional grounds. Defendants' argument that all of this time should be eliminated is simply a criticism of the strategic decision by Plaintiffs to file the motion at all; Defendants claim it was wholly unnecessary while Plaintiffs claim otherwise and explain in some detail that they filed the motion not wanting the Fifth Circuit to rule on statutory grounds (under the doctrine of constitutional avoidance) because the Louisiana Legislature could have subsequently amended the subject statutes to the Plaintiffs' disadvantage. (Rec. doc. 140 at p. 9). Given that the Fifth

26

Circuit had, *sua sponte*, sought to certify the question of statutory interpretation to the Louisiana Supreme Court, Plaintiffs' concern that the appellate panel would seek to avoid ruling on constitutional grounds was a reasonable one.  Accordingly, the Court finds the time expended in seeking affirmation on constitutional grounds was reasonable.

9. *Necessity of Litigation*

Finally, Defendants argue that the Plaintiffs should have undertaken greater efforts to have the Legislature amend the disputed statutes that the District Judge and the Fifth Circuit ultimately held were unconstitutional, rulings that were left undisturbed by the Supreme Court.  Brushing off the two failed attempts made in this regard by the Abbey, Defendants suggest that "had the Abbey and their counsel petitioned for a more narrow exception or variance as suggested by Defendants, there may not have been a need for litigation, which resulted in the excessive fees."  (Rec. doc. 137-1 at p. 18).  This altogether unorthodox argument simply cannot be credited – Plaintiffs were certainly under no obligation to agree to an otherwise unsatisfactory legislative proposal suggested by Defendants simply to avoid litigation in which they ultimately prevailed.  There is no reason – legally or logically – to penalize them for filing a lawsuit rather than agree to an alternative half-measure.

IV.   CONCLUSION

For the foregoing reasons, IT IS RECOMMENDED that Defendants, Paul "Wes" Castille, Belva M. Pichon, Craig G. Gill, Andrew Hayes, Wall V. McNeely, Margaret Shehee, Kelly Rush Williams, and Louis Charbonnet, in their official capacities as Members of the Louisiana State Board of Embalmers and Funeral Directors, and Patrick H. Sanders, in his

official capacity in place of Oscar A. Rollins (deceased), pay to Plaintiffs, St. Joseph Abbey and Deacon Mark Coudrain, $844,795.24 in reasonable attorneys' fees, as reflected above.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United States Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this 21st day of November, 2014.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE